UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
Urbana Division

| | |
|---|---|
| ALENA DENTON, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | Case No. 08-2134 |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| sued as Michael J. Astrue, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

In January 2008, Administrative Law Judge John Wood (hereinafter "ALJ") denied Plaintiff Alena Denton's application for disability insurance benefits (hereinafter "DIB") for a closed period from April 2004 to March 2006. The ALJ based his decision on findings that, although Plaintiff suffers from severe impairments and does not retain the capability to perform her past relevant work, she was capable of performing other jobs that existed in significant numbers during the requested closed period.

In June 2008, Plaintiff filed a Complaint (#1) against Defendant Michael Astrue, the Commissioner of Social Security, seeking judicial review of the ALJ's decision to deny DIB. In November 2008, Plaintiff filed a Motion for Summary Judgment (#8). In March 2009, Defendant filed a Motion for an Order Which Affirms the Commissioner's Decision (#12). After reviewing the administrative record and the parties' memoranda, this Court recommends, pursuant to its authority under 28 U.S.C. § 636(b)(1)(B), that Plaintiff's Motion for Summary Judgment **(#8)** be **DENIED**.

### I.  Background
#### A.  Procedural Background

Plaintiff applied for DIB in September 2004, alleging disability beginning April 10, 2004. The Social Security Administration (hereinafter "SSA") denied Plaintiff's application in February 2005, and again upon reconsideration in August 2005. Plaintiff filed a Request for Hearing, and requested a closed period of disability from April 10, 2004, to March 15, 2006.

Plaintiff then appeared and testified at the hearing in December 2007.  In January 2008, the ALJ denied Plaintiff's application for DIB based on findings that Plaintiff was not disabled within the meaning of the Social Security Act and that she was capable of performing jobs available in significant numbers in the economy.

In May 2008, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final decision.  Plaintiff then appealed this decision by filing a complaint with this Court pursuant to 42 U.S.C. § 405(g).  Plaintiff seeks an outright reversal.  In the alternative, she asks the Court to remand for reconsideration and to recommend that the Commissioner assign the case to a different ALJ.

## B.  Plaintiff's Background

In August 2003, Plaintiff visited Dr. Gregory Deters because of right elbow pain. (R. 235.)  On August 7, 2003 Dr. Deters limited Plaintiff's lifting to no more than ten pounds. (R. 235.)  Later in August, Dr. Deters told Plaintiff she could only do light work, and could not lift.  (R. 233.)  In September 2003, Dr. Deters told Plaintiff not to work for a week because of her right arm pain.  (R. 227.)  In October 2003, he told Plaintiff to remain off work and referred her to an orthopedic specialist.  (R. 223.)  In October 2004, Dr. Deters told Plaintiff to go to physical therapy for her arm pain and to use a TENS unit.  (R. 221.)

In November 2004, Plaintiff was released from physical therapy when her pain was at a rating of two on a pain scale of ten.  (R. 305.)  The physical therapist noted that Plaintiff can have a pain rating as high as eight on a pain scale of ten.  (R. 305.)  Additionally, Plaintiff had a physical therapy goal of achieving a pain level of less than four while at rest, a goal she had not met at the time of discharge.  (R. 305.)

Between September 2003 and May 2005, Plaintiff underwent multiple thyroid lab tests and test results showed fluctuations in her TSH and T4 levels.  (R. 319-27.)  The lab report from May 2005 indicated hypothyroidism, and stated that Plaintiff's medication dose should be increased.  (R.319.)

In October 2003, Plaintiff visited Dr. Donald Johnston because of arm pain that started after an IV infiltration followed by infection after gallbladder surgery. (R. 185.) Dr. Johnston limited Plaintiff's lifting, tugging, and pulling to no greater than five pounds. (R. 186.) Dr. Johnston could not determine what caused Plaintiff's arm pain, but believed it was not work-related because it had not improved after she quit work. (R. 179-86.) An April 2004 MRI of Plaintiff's right elbow showed minimal degenerative changes. (R. 193.) In May 2004, a bone scan showed no changes indicative of occult fractures or metastatic disease. (R. 192.)

In February 2005, Dr. Sandra Bilinsky assessed Plaintiff's residual functional capacity (hereinafter "RFC") and found she could occasionally lift or carry 20 pounds, frequently lift or carry ten pounds, and occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. 240-47.) Dr. Bilinsky did not find any manipulative, communicative, environmental, or visual limitations. (R. 243-44.)

In July 2005, Dr. Jerry Boyd concluded that Plaintiff had depressive disorder in partial remission secondary to psychotropic medications. (R. 274.) He reached this conclusion because Plaintiff told him that she had depressive symptoms for a year and that she was currently taking Lexapro. (R. 271.) Dr. Boyd gave Plaintiff a Global Assessment of Functioning (hereinafter "GAF") score of 60, and found her psycho-social stressors to be mild to moderate. (R. 274.) Dr. Boyd also noted that Plaintiff's attention, concentration, and short term memory were grossly intact. (R. 272-73.)

In August 2005, Dr. John Tomassetti completed a psychiatric review technique form on Plaintiff. (R. 276-89.) Dr. Tomassetti found that Plaintiff's impairments were not severe, did not equal listing 12.04, and she only had mild limitations in activities of daily living, social

functioning, and concentration, persistence, or pace. (R. 276-86.) Like Dr. Boyd, Dr. Tomassetti also found that Plaintiff had depressive disorder in partial remission. (R. 279.)

In June 2004, Plaintiff visited Dr. Ruth Craddock, a rheumatologist, because of her arm pain. (R. 311.) Dr. Craddock stated, "at this point in time she does not feel that she is able to return to her previous job duties and I would support her decision to stay off work a while longer until these problems are better defined." (R. 311.) In July 2004, Dr. Craddock told Plaintiff to talk to the Department of Rehabilitative Services because she would benefit from working in an office. (R. 310.) In August 2004, Dr. Craddock put Plaintiff on Lexapro to help control her pain. (R. 309.) Because Plaintiff reported good days and bad days, Dr. Craddock made a note to watch Plaintiff's thyroid. (R. 309.) In October 2004, Dr. Craddock limited Plaintiff to a five-pound maximum for pushing and pulling with her left arm, and no pushing or pulling with her right arm. (R. 307.)

In January 2005, Dr. Craddock wrote a letter to Plaintiff's insurance company opining that she was obligated to believe Plaintiff's complaints of pain, and Plaintiff was unable to work because of the severe pain. (R. 343-45.) In September 2005, Dr. Craddock noted that Plaintiff's right arm pain was diffuse and chronic, and that Plaintiff rated it as seven or eight on a pain scale of ten at its worst. (R. 298.) In addition, Dr. Craddock noted Plaintiff's complaints of being tired and having to write things down so she could remember them later. (R. 298.)

In January 2006, Dr. Craddock filled out a fibromyalgia worksheet, noting that Plaintiff experienced pain at seven of nine bilateral tender points. (R. 296.) On the worksheet, Dr. Craddock opined that Plaintiff "remains disabled, unable to do her job at this time." (R. 296.) Dr. Craddock also completed an RFC report, finding that Plaintiff needs to avoid moderate exposure to wetness, humidity, and noise, and all exposure to extreme temperatures, fumes, and hazards. (R. 299-301.) Dr. Craddock also noted that Plaintiff's condition would cause her to be absent from work about three times a month, and to take more breaks than a normal work day at sedentary level allows. (R. 299-300.) Dr. Craddock completed the

worksheet and RFC in January 2006, even though the last time she saw Plaintiff was in September 2005. (R. 299.)

In March 2006, Plaintiff told Dr. Craddock that she had a "bad slump" in November when she turned 40 and was having financial difficulties. (R. 249.) Plaintiff asked Dr. Craddock if the Lexapro she was already taking would help her depression. (R. 249.) Dr. Craddock told Plaintiff that she should see her primary care physician or an appropriate mental health specialist regarding the depression. (R. 249.) Dr. Craddock further noted "? Depression" in her "impression" section of the medical chart. (R. 249.)

In August 2006, Dr. Craddock noted that Plaintiff still has fibromyalgia and that she had told Plaintiff on multiple occasions that Plaintiff could return to work and is medically capable of performing fairly sedentary activity. (R. 292-93.)

### C. The Hearing Before the ALJ

In December 2007, the ALJ held a hearing at which Plaintiff and Bob Hammond, a vocational expert (hereinafter "VE"), testified.

Plaintiff testified that she lives in a single story house with her boyfriend. (R. 350-51.) She does not often drive because of her medication and "other things." (R. 351.) She has completed one year of college. (R. 352.) Her last job in 2004 involved packaging at a factory. (R. 353.) After Plaintiff hurt her arm, she worked at various positions at the factory before she went on short-term disability. (R. 353-56.) Most days when she got home from work she hurt so bad she did not want to get up. (R. 366.)

Plaintiff testified that when she went on short-term disability at work, she "bottomed out" for about 15 months, and during that time she mostly watched television all day and avoided strenuous activity. (R. 358.) Her boyfriend prepared dinner, and she helped dry and stack the dishes. She could do laundry but not as efficiently as before her arm began hurting. (R. 358-59.)

She could sweep with the broom, but could not vacuum because it hurt her arm too much. (R. 359-60.) She stopped seeing her friends and stopped going to her monthly club meetings. (R. 360- 64.) Plaintiff's boyfriend had to pay the bills until around December 2005, when Plaintiff was able to resume paying the bills. (R. 364.) She was unable to garden in 2004, but she had a tomato garden in 2005, and has branched out since then. (R. 366.)

The ALJ gave the VE a hypothetical question regarding an individual who is limited to lifting, carrying, pulling, and pushing a maximum of five pounds, cannot lift overhead, can only occasionally reach with her dominant arm, needs to avoid environmental hazards such as unprotected heights and dangerous machinery, and needs to avoid even moderate exposure to all the other environmental factors such as extreme temperatures, wetness, humidity, pulmonary irritants, and vibrations. (R. 368.) The VE testified that such an individual could work as a surveillance system monitor or a circuit board screener. (R. 369.) He testified that a circuit board screener would require 98% on-task activity, and a surveillance system monitor would require 85% and above. (R. 370.) He opined that only one absence a month would be allowed, after a probationary period of 30-60 days. (R. 370.)

### D.  The ALJ's Report and Decision

The SSA defines "disabled" as the inability "to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). To determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must proceed through a five-step analysis. 20 C.F.R. § 416.920(a)(4). If the claimant is currently employed or was previously employed during the relevant period, he is not disabled. 20 C.F.R. § 416.920(a)(4)(i). The second question is whether the claimant has a severe medical impairment that will last at least twelve months. 20 C.F.R. § 416.920(a)(4)(ii). If the claimant does not have a severe impairment, the claimant is not disabled, and the inquiry ends. *Id.* The third question is whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the Regulations. If he does, the claimant is considered disabled and the inquiry ends there. If not, between steps three and four, the Commissioner determines

the claimant's residual functional capacity, that is, the work he is still able to perform despite limitations. 20 C.F.R. § 404.1545. The fourth question is whether the claimant is able to perform his past relevant work with his current impairment. 20 C.F.R. § 416.920(a)(4)(iv). If he can, then he is not disabled. *Id.* If he cannot perform his past work, the fifth and final question is whether, with his current limitations, he can perform other work which exists in significant numbers in the national economy. 20 C.F.R. § 416.920(c)(1).

The claimant bears the burden of production and persuasion at steps one through four. Once the claimant shows he is unable to perform past work, the burden shifts to the Commissioner to show that the claimant is able to engage in some other type of substantial gainful employment. *Campbell v. Shalala*, 988 F.2d 741, 743 (7th Cir. 1993).

Here, the ALJ found that Plaintiff has severe impairments including fibromyalgia and hypothyroidism, but those impairments do not meet or medically equal any of the listed impairments. The ALJ determined that Plaintiff has the RFC to engage in a limited sedentary range of work. The limitations stated that she could lift, carry, push, and pull a maximum of five pounds, could frequently reach with the nondominant arm but only occasionally reach with the dominant arm and never reach overhead with either arm, could engage in all other manipulative functions frequently, could not work at unprotected heights or around hazardous machinery, and needed to avoid even moderate exposure to all other environmental factors. Based on this RFC and the VE's testimony, the ALJ determined that Plaintiff was able to perform certain jobs that exist in significant numbers in the national economy, therefore, Plaintiff was not disabled as defined by the Social Security Act.

## II. Standard of Review

The ALJ's decision is subject to review pursuant to 42 U.S.C. § 405(g), which provides that "the findings of the commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The United States Supreme Court has defined

substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consol. Edison Co. v. New York*, 305 U.S. 197 (1938)). Where conflicting evidence may allow reasonable minds to differ as to whether a claimant is disabled, the responsibility for making that determination rests with the ALJ. *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996); *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). Therefore, the question for review is not whether the claimant is disabled, but whether substantial evidence in the record supports the ALJ's finding of no disability. *Id.* The Court defers to the ALJ's determinations of credibility, "so long as they find some support in the record." *Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir. 1993).

### III. Discussion

#### A. Step Two of Five-Step Analysis

Plaintiff first argues that the ALJ erred at step two of the five-step sequential evaluation process when he did not consider Plaintiff's depression a severe impairment. The Seventh Circuit has found that "step two is a threshold analysis that requires [claimant] to show only that he has *one* severe impairment." *Bradley v. Barnhart*, 175 Fed. App'x 87, 90 (7th Cir. 2006). When an ALJ fails to label an impairment as severe, but has proceeded beyond step two of the five-step analysis, he has not committed a reversible error. *See Curtis v. Astrue*, No. 3:08-cv-42-WGH-RLY, slip op. at 11 (S.D. Ind. May 18, 2009).

Here, the ALJ found that Plaintiff had two severe impairments. Accordingly, the ALJ's failure to label Plaintiff's depression as a severe impairment does not constitute reversible error.

#### B. RFC Finding

Plaintiff next argues that the ALJ failed to consider her depression, or depressive-like symptoms, when determining her RFC. Specifically, she contends that the ALJ failed to

acknowledge she was on Lexapro, an anti-depressant, failed to consider her GAF score, failed to reject the nonexamining state agency psychological consultant's opinion, and inappropriately determined the proper treatment for Plaintiff's "slump."

Dr. Craddock prescribed Lexapro to help control Plaintiff's fibromyalgia pain. When Plaintiff asked Dr. Craddock if the Lexapro would address her depression, Dr. Craddock told her to see her primary care physician or a mental health specialist. While Lexapro is also an anti-depressant, Dr. Craddock did not prescribe it for that purpose. Based on this evidence, the Court concludes that the ALJ did not err by failing to mention Lexapro was an anti-depressant.

Regarding the ALJ's failure to consider Plaintiff's GAF score, the Court notes that the SSA discourages the use of GAF scores when considering whether a claimant is disabled because the scores do not have a direct correlation to the severity requirements in the listings for mental impairments. 65 Fed. Reg. at 500746-65. The ALJ did not incorporate Plaintiff's GAF score into his RFC, but he was not required to. Thus, his failure to do so does not constitute reversible error. *See Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985) (stating that the ALJ is not required to "evaluate in writing every piece of testimony and evidence submitted").

Plaintiff also contends that the nonexamining state agency psychological consultant, Dr. Tomassetti, failed to identify the basis for his opinion, and therefore the ALJ should have rejected his opinion. In his decision, the ALJ discussed relevant evidence in the record and concluded that the evidence supported Dr. Tomassetti's assessment. After reviewing the record, the Court cannot conclude that the ALJ erred by his treatment of Dr. Tomassetti's opinion.

Plaintiff next contends that the ALJ improperly played doctor when he described Plaintiff's depression as "situational" and discussed her lack of social activities. Although the ALJ's comments regarding the situational nature of Plaintiff's depression are not necessary to his decision, the Court notes that they are not inconsistent with the evidence in the record and

Plaintiff's statements. Regarding the second issue, the ALJ stated that Plaintiff's limitations on her social activities were self-imposed based on her chronic pain and her reluctance to explain and justify her condition. The record supports the ALJ's characterization and the Court cannot conclude that the ALJ erred by finding that Plaintiff's depression caused minimal limitations on her social functioning.

The ALJ explained his reasons for concluding that Plaintiff's depression did not constitute a severe mental impairment, including lack of complaints of depression, lack of references to depression in the medical record, and the fact that many of her purported symptoms of depression are attributable to fibromyalgia pain. As a result, the ALJ found that the evidence failed to establish that Plaintiff's depression constituted a severe mental impairment. The Court has reviewed the ALJ's explanation and finds that the record supports his reasoning. Accordingly, the Court cannot conclude the ALJ erred by failing to include any symptoms of depression in the RFC.

### C. Misstated or Omitted Evidence

Plaintiff next argues that the ALJ misstated and omitted evidence, including failing to acknowledge that Lexapro is an anti-depressant, erroneously concluding that Plaintiff's medication addressed her thyroid condition, omitting the physical therapist's comments, and misstating Dr. Craddock's opinions.

The Court discussed the ALJ's consideration of Lexapro above and will not repeat it here.

The ALJ stated that Plaintiff's thyroid condition constituted a severe impairment but found that it was adequately addressed by her medication. The ALJ based this conclusion on the fact that Plaintiff's chief complaint throughout the record was fibromyalgia and Plaintiff takes medication for her thyroid problem. The record contains a note from Dr. Craddock stating that "fibromyalgia pain is often worse in the setting of thyroid disease." (R. 307.) However, this is

clearly a general statement, and although Dr. Craddock asked for records related to Plaintiff's thyroid condition (R. 311), none of Dr. Craddock's subsequent clinic notes indicate that Plaintiff's thyroid condition exacerbated her fibromyalgia.  The record also contains clinic notes suggesting that Plaintiff's medication needed adjustment from time to time.  Other than that, Plaintiff presented no evidence regarding her thyroid condition or the effects of her medication.  As a result, the Court finds the ALJ did not err by concluding that Plaintiff's medication adequately addressed her thyroid condition.

Regarding the physical therapist's report, the ALJ described this report in detail, noting that Plaintiff's arm pain was a two on a pain scale of ten after treatment, and that her pain is less after physical therapy.  He also acknowledged that Plaintiff's pain can be a seven or eight on a pain scale of ten as stated in the report. (R. 29.)  Although an ALJ is not required to address every piece of evidence in writing, the ALJ may not simply pick out portions of a medical report that favor denial of benefits, while ignoring those favorable to disability.  *Zalewski*, 760 F.2d at 166; *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984).  Nevertheless, here it appears that the ALJ duly noted the evidence Plaintiff claims he omitted.

Plaintiff raises a number of other arguments on relatively minor points.  The Court has considered those arguments and finds they do not constitute reversible error.  A critical review of the evidence reveals that although the ALJ's decision was not perfect, substantial evidence supports his conclusions and any errors were harmless.  "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different decision."  *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989).

### D.  Treating Physician's Opinion

Plaintiff next argues that the ALJ erred by failing to give Dr. Craddock's opinion controlling weight.  First, Plaintiff contends that the ALJ engaged in improper speculation (1) when he stated that because other individuals with fibromyalgia can work, implying that Plaintiff can work, too; and (2) when he questioned the reliability of Dr. Craddock's January 2006 conclusion of disability.  Second, Plaintiff contends that the ALJ erred by considering Dr. Craddock's clinic notes dated March 15, 2006, or later, because those opinions are irrelevant to the closed period for which Plaintiff seeks benefits.

As Plaintiff noted, the ALJ stated in his decision that "many people with fibromyalgia still work."  (R. 31.)  Other Seventh Circuit cases have referred to the ability of people with fibromyalgia to work.  *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("Some people may have such a severe case of fibromyalgia as to be totally disabled from working . . . but most do not."); *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998) ("Fibromyalgia is not always (indeed, not usually) disabling.").  Here, the ALJ stated that he did not accept Dr. Craddock's conclusion of disability because it was unsubstantiated, not because other people with fibromyalgia can work.  20 C.F.R. § 416.927(e)(1) (stating that the Commissioner is responsible for determining whether a claimant is disabled and "a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled").  Thus, the ALJ did not rely on the fact that other people with fibromyalgia could work in making his decision regarding Dr. Craddock's opinion.  Accordingly, the Court concludes that the ALJ did not err by making that comment.

Regarding the doctors' reports that were dated after Plaintiff's closed period, Plaintiff contends that they are irrelevant and the ALJ should not have considered or discussed them.  The ALJ discussed Dr. Craddock's opinion from August 2006 because Dr. Craddock stated at that

time that she had told Plaintiff "on multiple occasions that the claimant should probably be able to return to work in some capacity." (R. 292.) This comment is relevant to the closed period of disability because it refers to events occurring during the relevant time period. Thus, the ALJ did not err by considering Dr. Craddock's August 2007 report. On the other hand, Dr. Craddock's February 2007 report does not appear to address Plaintiff's condition during the relevant time period. Nevertheless, as the ALJ indicated, it provides background for the ALJ's subsequent discussion of the inquiry by Plaintiff's attorney about when Dr. Craddock thought Plaintiff first became capable of performing sedentary work on a sustained basis. (*See* R. 32.) Dr. Craddock's February 2007 clinic notes were not necessary to the ALJ's decision. However, the record contains nothing that indicates the ALJ relied on the February 2007 information when making his decision. As a result, the Court cannot conclude the ALJ committed reversible error by referring to these records.

### E.  Credibility

Although Plaintiff did not directly challenge the ALJ's credibility findings in her motion, she stated in her response that she had not conceded any issues related to credibility and that she challenges the ALJ's credibility findings by the general discussion of his errors. The Court has addressed Plaintiff's arguments above. Plaintiff presented no further discussion or argument on the issue of credibility. In absence of further discussion, the Court cannot conclude the ALJ erred in assessing Plaintiff's credibility.

### IV.  Summary

For the reasons set forth above, this Court recommends Plaintiff's Motion for Summary Judgment **(#8)** be **DENIED**. The parties are advised that any objection to this recommendation must be filed in writing with the clerk within ten working days after being served with a copy of

this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538, 539 (7th Cir. 1986).

ENTER this 29th day of June, 2009.

s/ DAVID G. BERNTHAL<br>U.S. MAGISTRATE JUDGE